05-1570. I guess we have a little shuffling around here, so I'll not give you a little time. Somehow, with all the shuffling, I thought people were leaving, but not exactly. When you're ready, Mr. Klemlich. Thank you, Your Honor. May it please the Court, Mark Klemlich and Alan Morrison on behalf of Coleman McFarling. I probably ought to begin by addressing the Monsanto v. Scruggs case, which was decided after briefing was completed in this matter. In Monsanto v. Scruggs, the Court held, as the original McFarling decision had before it, that the doctrine of patent exhaustion was inapplicable. We think the primary reasoning it did so was the statement that, quote, there was no unrestricted sale because the use of the seeds by seed growers was conditioned on obtaining a license from Monsanto. We think that fact critically distinguishes this case in the procedural posture in which it now arises. After this case was last at this Court, Monsanto made a strategic decision to abandon any claim that there was an enforceable technology agreement that Mr. McFarling had violated. It decided instead to proceed only on one of the two patents, the 605 patent. We think that means that the exhaustion issue has to be addressed in this case without the benefit of Monsanto's claim of a restricted licensing agreement that changes exhaustion. It needs to be treated as an unrestricted sale. Mr. Lemley, as I recall, the exhaustion issue was raised in a reply brief, not in the principal brief. And that's not an issue that we normally will entertain. Why don't you direct your argument to what was raised in the principal brief of your appellant? I think you weren't on it, but nonetheless, you're representing Mr. McFarling. And that's the question whether the damages could have been awarded under the 605 patent. I'll happily do that, Your Honor, although I do think, in fact, we haven't waived the issue, and I'd like to address that at some point if the Court would like. Let me focus on damages. Actually, I would, if you could briefly say why. Certainly, Your Honor. The argument made in the original appellate brief is a patent misuse argument that says the rights are outside the scope of the patent grant. That's a requirement for patent misuse. The argument was by dropping the 435 patent at trial in the district court, which explicitly covered seeds, and going to the 605 patent, the 605 patent didn't cover seed saving. In their response brief, Monsanto argued— Don't the seeds have the genetic code? Yes, Your Honor. And Monsanto argued in the response brief, we don't need the technology agreement here because we have the 605 patent, and the 605 patent covers a genetic code for a promoter region. That shows up in the new seeds as well. We responded in the reply brief, Your Honor, by saying that argument is inconsistent with the exhaustion principle once you treat this as a first sale, and so we think it's preserved. On the damages issue the judge would have referred to, there's no disagreement in this case as to how much seed was replanted. Had McFarland purchased that seed during the two years before he was enjoined, he would have paid Monsanto $6.50 a bag, just as every other farmer in the country does. The jury awarded damages of $40 a bag, more than six times that amount. It did so based on Monsanto expert Hoffman's testimony that Monsanto would demand that additional money to guard against the possibility of replanting for multiple years and the possibility of transfer to third parties. Why, as just a matter of fact, wouldn't one seed planted produce a plant that would give them 50, 60, 80, 100 seeds? Why, then, wouldn't there be some logic to the jury's conclusion that the $6.50 bag would quickly multiply in subsequent years to four more? Your Honor, the question is what you can do with those seeds. Monsanto knows when it sells a bag of seeds that all of those seeds are going to be planted, and you can sell those multiple seeds as food. The question is can you replant them in subsequent years or sell them to third parties? In this case, McFarland was under an injunction preventing him from doing either thing. And so there was no risk whatsoever that he was going to do the things that would cause that harm. There's no question here but that he has always complied with injunctions once they were issued in this case. That fact distinguishes this case from Monsanto versus Ralph, where the defendant in fact sold seeds to third parties, lied about it under oath, repeatedly destroyed evidence, and was sanctioned for his repeated misconduct. The court there upheld the similar damages that were a kicker or a multiplier, if you will. That was in part because, quote, there is evidence that at least some of that seed was transferred to others. The potential risk to Monsanto's business from such a transfer goes far beyond any harm that would have come from Ralph's burning seed. That risk wasn't present here. Indeed, the district court found that McFarland's conduct stands in stark contrast to that of Ralph. Awarding extra damages for hypothetical future conduct while also enjoining that conduct is duplicative. As indeed, this court specifically held in McFarland, too, in rejecting Monsanto's effort to get excess liquidated damages under the contract. The court there said, quote, Missouri law does not permit double recovery for the same injury. I submit that that's equally true of patent law. What Monsanto persuaded the jury to do was to award what are, in effect, punitive damages far in excess of the reasonable royalty, and indeed that far exceeded Monsanto's lost profits. That's directly contrary to this court's rule in Rupert v. C.R. Bard. Reasonable royalty damages are not designed to punish or to deter. That's what enhanced damages are for. But the district court refused to award enhanced damages in a thoughtful opinion, and Monsanto didn't appeal that decision. To affirm the jury verdicts here would undo that rule. We don't think Ralph should be understood to be at odds with more than two decades of this court's precedent. But if it is, this court should follow Merker and Nixon in relying on the established royalty because of the rule that if a case is in conflict, the first in time case is the one that has to be followed. And alternatively, at a minimum, if this court concludes that Ralph is not distinguishable, we request that the panel refer the issue on a box because of the conflict. I'd like to say a bit about the injunction issue in the Cross Appeal, if I may. District court has broad discretion not only to decide whether an injunction is appropriate, but to determine the terms of that injunction. District court enjoined McFarling from saving and replanting or from transferring seed. It did not, however, enjoin McFarling from doing what every other farmer in America can do, purchasing Monsanto seed from 250 authorized seed dealers, paying the license fee, and agreeing to the technology agreement. Monsanto asks this court to impose a punitive injunction that does far more than prevent infringement. It puts McFarling in a worse position than he would have been in before the infringement, in order to punish him for having the temerity to test the legality of Monsanto's conduct. There's no precedent for using injunctive relief in this way. Indeed, this court said in Amstar v. EnviroTech that, quote, punishment is not the purpose of an injunction. That's particularly true because the district courts expressed finding repeatedly in the final opinion that Mr. McFarling never acted in bad faith, that all of his conduct during the course of this litigation was in good faith. Monsanto's statements in its surreplied brief that McFarling has stated he intends to continue infringing are patently false. That's simply not true. What Mr. McFarling stated in the year 2000 was that he thought it was legal to replant seed, and he intended to do so unless he was enjoined. Once he was enjoined in 2001, he has never done so again. Nor does Monsanto's analysis of the four factors justify broadening the injunction. Monsanto's claim of irreparable harm and inadequate remedy at law presumes more infringement, something that's already been enjoined. It can't show irreparable harm. Indeed, it can't show any harm whatsoever from having McFarling plant seeds once he's lawfully purchased them from an authorized grower, and if he complies with the technology agreement. Indeed, Monsanto's going to make a handsome profit from those purchases. After eBay, Monsanto's claim that the balance of hardships can essentially never favor the infringer, I think, is also unsupportable. It's true that being made to stop infringing is not a hardship that courts will consider, but that's not the hardship that's being claimed here. He's already been enjoined from infringing. It's the difficulty of switching away from roundup-ready soybeans after you've planted them in the field, after you've adopted the technology, that is the hardship the district court considered. And given that there's no hardship whatsoever to Monsanto, since he's already enjoined from infringing, the balance of the hardships, we think, clearly favors McFarling. If the court has no further questions, I'm happy to reserve the remainder of my time. We will save you time, Mr. Lindley. Thank you, Your Honor. Mr. Wilson. I may appease the court. There are three points that I'd like to make this morning. The first is that Mr. McFarling's challenges to Monsanto's licensing provisions are essentially foreclosed both by this court's decisions in McFarling II and by the court's decisions in Scruggs, which address virtually every point that has been raised today and ruled in favor of Monsanto. And that reasoning applies both to the 435 and the 605. Well, help me with the reasoning then that the $40 a bag isn't a bit excessive when you've already enjoined any repetitive future sales or other replanting of the seed. Well, first of all, turning to the dam— Do you perceive that as being already answered by the earlier cases? I certainly perceive that as being answered by Ralph, because the Ralph decision really addressed virtually every argument that's being raised here today about what should have been a reasonable royalty. I mean, when you look actually to what Mr. McFarling actually argued in his brief about what the appropriate royalty should be, all he really argues is that $6.50, which was the technology fee, was an established royalty. And this court clearly rejected that in Ralph. If you then turn to the basis on which Monsanto's expert testified, both in Ralph and in this case, Mr. Hoffman, he explained to the jury that he was adopting what was called a split-savings approach, which is an approach that this court has approved in its prior decisions as a basis for a reasonable royalty where there is no established royalty. He explained how he calculated that decision. He then took into effect both the other benefits that Mr. McFarling obtained from using Roundup Ready Seed in an infringing manner and also certain harms to Monsanto. But isn't that the key, in an infringing manner? I mean, the point that seems to me is, and I agree with Judge Rader, that I'd like to hear about is why is it that, given there's an injunction, that this is not excessive? If you assume that there will be compliance with the injunction, and I can see it, in other words, if you have one bag of seeds, you can ultimately have all of Mississippi using your seeds. And so, sure, you can say that bag of seeds is worth a lot of money. But if you are foreclosed from doing anything that goes beyond the scope of the technology agreement with the seeds, then how do you get to a very large number? Well, first of all, let me point out to the jury. They reduced it down to what happened. I understand that. It's still a pretty large number, given the price charged for that bag of seeds at the seed store. Well, the price for the bag of seeds at the seed store was $25. So $40 royalty on a $25 bag sounds like a lot. No, not when you consider, I think Judge Barr said, what Mr. Hoffman testified about what were the potential benefits to Mr. McFarlane from using infringement. But they all have to assume multiple use, don't they? You can't get more than $25 value out of a $25 product unless you're in a multiple use situation. I don't think that's right, Judge Rager. He specifically testified that what he was testifying to was a license, assuming a hypothetical license, of course, for one year as we planned it in the second year, But that's enjoined, right? But he specifically was asked, is this a paid-up license? And he said, no, this is not a paid-up license. I'm not testifying that this is what would be adequate to Monsanto if you just said, here, take this and do with it what you want, including selling it to everybody else. He specifically said, this is what I think would be the benefit to Mr. McFarlane and how Monsanto should be compensated just for replanting in the second year in an unauthorized manner. And remember, it's a hypothetical negotiation. And at the hypothetical negotiation, you don't know whether there's going to be infringement. And so you do have to take into account not just what he actually did with the bags, but certain possibilities of what he might be doing and that there's a risk there. But not just the risk. There were also benefits to Mr. McFarlane that are on the plus side of the ledger. And all of these arguments were essentially raised in Ralph. Now, Mr. Levely says, well— Well, the injunction issue, I guess, was not— Well, I think the injunction—I mean, Ralph was—Mr. Ralph was enjoined also. But he had not—I mean, this is an issue I want to ask you about, too, but he at least seems to have been committed to a different course of action at least from the course of action that Mr. Levely is asserting on behalf of his client. Well, the evidence in the case certainly was that Mr. Ralph had sold the seat and destroyed the evidence and so forth. But that did not factor into the jury's calculation of damages. And it does not factor into the basis on which this court affirmed the award of the royalty in Ralph. So I think that the reasoning—really, when you get right down to it, what Mr. McFarlane has presented two challenges to his damages. One is it should have been $650,000, which I think clearly cannot be the right answer. And the other is Mr. Hoffman wasn't— But how do you get to $40,000 with the injunction in place and address it with the injunction in place? This is rather important. I think you get to $40,000 because even—this is a hypothetical negotiation. The hypothetical negotiation—and remember, the infringement— Is it a hypothetical negotiation with the presumption of no future infringement or not? Oh, I think the hypothetical— Because that's what we have. The hypothetical negotiation is, as Mr. Hoffman testified, to you will replant in one year. You'll take this one bag and replant it in one year. And that is all. And the hypothetical—and it's— So one year of infringing conduct. Right, one year. Not the first year of lawful conduct. That's correct. That's correct. And the evidence was that there was—of course, Monsanto would never have licensed that given its business model. And that the amount of compensation that Monsanto had to take into account, what that activity—the danger that that activity would do to the business model, to Monsanto's relationships with the seed companies, and to the brand, which I think is also very important. Because if Roundup Ready Seed is mixed with non-Roundup Ready Seed when it's harvested, and then somebody sprays Roundup over it and some of the seed dies, that's— Are those presumptions taking into account the injunction? Well, I mean, again, he was—Mr. Hoffman testified in a world where it was hypothetical, and so you didn't know whether the injunction was issued. But there was certainly a risk—I would say there was some risk of infringing behavior thereafter, but not—but you don't know. And I think that's always the case with a hypothetical negotiation. And his methodology, which was the split savings methodology, which really is all that the Daubert channel, I think, can go to. Well, Monsanto's own expert testified about a split savings methodology. He came up with different numbers. But really, I think once you get past those two problems, I think really all you have is a challenge to the number. And that's a very, very deferential standard of— Well, it is. You're certainly right about that. It's just that there has to be some basis for it, and we're, I think— And I'm having— Let me ask you a question, which I should know the answer, but I don't, and so help me out. Give me the chronology of events with respect to the infringing activity that was before the trial court and is before us and the injunction so that we have a sense of when what happened that we should be paying attention to how to calculate damages as of when. There was a stipulation in the record that says Mr. McFarling replanted about— Okay, and that's the infringing conduct, 1998 and 1999. Those were backs from those years' harvests. And the jury awarded $40 per unit for each of those backs. The case was brought in the year 2000. A temporary restraining order was entered in April 2000. The preliminary injunction was entered in 2001. We have not argued that infringement took place after those orders were entered. So that's—and the stipulation is that—the stipulation is in the joint appendix. Okay, so at the time of the infringement at least, Mr. McFarling was free in his own mind at least to continue to replant for additional years. Well, he had been approached by representatives of Monsanto who had discovered this activity. Right, but there was no legally binding prohibition against his doing that other than the agreement. He was told so when he signed the technology agreement. There was no injunction in place. There was no injunction, that's correct. I do want to say a few words about a cross-appeal because I think that there is a little bit of a chispassing of an idea about the issue on a cross-appeal. Our principal concern about the district court's order is that as we read it, it very arguably compels Monsanto to grant a license to Mr. McFarling. And I do want to make clear that is our principal concern with the district court's order. Now, perhaps Monsanto submitted an order to the district court for a permanent injunction that was basically the same as the preliminary injunction that would have said, you may not obtain, plant, save, replant, etc. The district court wrote a different order in which he said, Mr. McFarling may not infringe by replanting. But then the court went on to say except that, Mr. McFarling may plant any Roundup Ready seeds that he obtains from a lawfully authorized dealer. We read that order and were very concerned because we read it and it very arguably said, Mr. McFarling may plant. And we said, does this require us to license our technology to Mr. McFarling even if we don't want to because our position is that we don't want to sell Roundup Ready seeds to Mr. McFarling in the future. So we went back to the district judge and said, Your Honor, we're very concerned about this order. Could you please clarify the order and insert some language, which is in our brief, I think it's on page 61. It's italicized, page 61. And we said, please make clear that whatever this order means, that Monsanto is not required to license the technology to Mr. McFarling. The district court denied our motion to alter a man's judgment. And in her reasoning, she says, Monsanto argues that ordinarily nobody has any right to or any obligation to license its patented invention to anybody. However, this case is different. And then she proceeds to explain that her reasoning for why this case is different. Our reading of this order is that it very arguably compels Monsanto to license Mr. McFarling. And we think that that is legally erroneous because of the general rule of patent law that an inventor is not under any legal obligation to license its technology to anybody. And that is just, I think, a general legal principle that the district court overlooked. And second, to the extent that one drills down into the district court's basis for rejecting our argument here, she said Monsanto is just non-selective in licensing its technology. And that's just factually wrong, which is that Monsanto does have a policy of not licensing its invention to certain people as to whom it believes there is a risk of infringement in the future or what have you. And so I think that our principal concern is that this appears to be the operation of the district court's order. And I think the district court's injunctive order should be reformed at least to the extent that it seems to compel Monsanto to license its technology to Mr. McFarling. I'd like to reserve the remainder of your time for rebuttal and recross appeal if there's something to rebut. Your Honor, let me begin by addressing the damages issue. Let me be clear first off that the only reason the jury had in testimony to award $40 rather than $60.50 as a royalty was the testimony of Monsanto's expert, Mr. Hoffman, that Mr. McFarling could use the seed again and again for multiple years. That is in the appendix of record of 972 to 973. Now is that when you say multiple years? Are we talking about post-injunction years? Yes, Your Honor. Are you talking about the two-year period between 1998 and 2000? No, we're talking about post-injunction years. The question, how did you choose the seed multiplication factor? Answer, it's part of the equation that saved seed could be saved for multiple years. Growers save it for a number of years and it could be saved for a long time. That's part of it because there's a risk that if a grower saves one year, he's going to continue to save. So that's a factor in the equation, but not the only reason. It goes on then to say you do that on an every-other-year basis, and that way you get more, basically get more use out of the same seed. Clearly, the testimony is referring to the idea that I'm going to get the seed once and never again, use it again and again and again. And that's simply not appropriate in circumstances where there's an injunction in place. Mr. Wilson, though, talks about damage to business reputation, et cetera, as justifying the $40. Why can't the court affirm on that basis? Well, Your Honor, I think the theory has to be what Mr. Wilson effectively is saying, that we wouldn't license at any price. And therefore, you should give us a really high price because we wouldn't license at any price. But I think that's not what the reasonable royalty rules are designed to do. The reasonable royalty rules are designed to determine when there was, in fact, infringement, what was the closest business deal we would have had if there wasn't infringement, if the parties instead had come to a deal. That closest business deal, I think, for one year's worth of infringing, for replanting for two years, would never have been $40 a bag because Mr. McFarland could go down the street to any of the seed companies and buy those bags for $6.50. He would never have agreed to, and no farmer would have agreed to, a six times multiplier to compensate for business reputation. I suggest also that there isn't any risk to business reputation. It's important to realize that Mr. McFarland never resold the seed to a third party. He replanted it on his own farm, just as he'd done with all the other seed he'd purchased throughout his career as a farmer. That turned out to be an act of infringement in the district court. And so he was enjoined from that. But there's no harm to Monsanto here beyond the sales that it lost at $6.50. Now, you made a motion for – I'm sorry, were you done with that? Yeah, please go ahead. You made a motion for remittiture. Yes. And was the injunction point pressed in that motion? I believe it was, Your Honor. Yeah, we made a motion for remittiture, which is in the record, appendix 1746. We also offered two proposed jury instructions that, if adopted, both correctly state the law, and we think would have solved this problem from coming about, saying that you're not entitled to recover the defendant's gain, that the point of patent damages is to compensate the plaintiff for their losses, not to constitute a disgorgement or unjust enrichment remedy, and saying that Monsanto is not entitled to compensation for losses to third parties. Mr. Wilson referred to $25 purchases of seed bags from the seed-growing companies because the seed sellers, it turns out, also jacked their price up. But that's not injury to Monsanto. Monsanto's loss is $6.50 every time it loses a sale of bags of seed. Finally, I should note in this issue that the – There is something a little strange about saying in the reasonable royalty setting that we will – setting the injunction aside for a moment, saying that we will calculate the reasonable royalty as if the parties engaged in the hypothetical negotiation is going to comply with all the restrictions, which that party has no intention to comply with. In other words, if I go down to CompUSA to buy a version of Microsoft Windows for $200, presumably the royalty is $100. But if I intend to use that in an infringing way to spread it all over the city of Washington, I would pay more for that license than $100. Absolutely, Your Honor. But what we suggest – Go ahead. What we suggest is that Monsanto can't have it both ways. If Mr. McFarling would have paid $40 for an unlimited right to use the seed, to replant it over and over, to sell it to third parties, then he ought to be able to use that seed over and over and to sell it to third parties. The court should lift any injunction and allow him to continue to use the seed. If it's not, in fact, the case that he's getting that right because he's going to be enjoined for making those additional uses, then I submit he wouldn't and no one reasonably would pay that extra money for a right that they ultimately never got. I should note, finally, in that respect, that the risk that if we adopt a general rule of a multiplier, that the threat or the possibility of ignoring an injunction justifies a multiplier in reasonable royalties, you will hear that argument from every patentee who comes before this court in the future. Finally, on the injunction issue, the first thing to note here is there is no compulsory license in this case. Indeed, the injunction doesn't bind Monsanto at all. So if you were to go, if Mr. McFarlane were to go down to the seed store and say, I'm ready to, you know, I give up, I'm ready to go with the program, and they say, sorry, you're on the blacklist, then you'd walk away and say, I think, yeah, I think that's right. It's too bad. Well, then you all don't, I don't sense that there's any disagreement between the two of you. Well, maybe there's not. We understand what's in the briefs, though not admittedly, Mr. Wilson. They're concerned that this injunction will be read in a way that I think you've just said you would not press it to be read. That's correct, Your Honor. What we think is that we think Mr. McFarlane should be able to try to purchase the seed. We think that Monsanto, while it claims to have an unauthorized grower list and to treat the technology agreement as an application for a license, doesn't in fact operate that way. Yeah, but if they started one tomorrow and McFarlane were the only one on it, then you would say that's just bad luck for Mr. McFarlane. That's correct, Your Honor. We do not think that Mr. McFarlane, and we don't think the district court's order intimates that Mr. McFarlane is, Monsanto is obligated to sell Mr. McFarlane. Some of her comments in connection with denying the modification seem to me to suggest perhaps an inclination in that direction. But you're saying that's not your position with respect to the meaning of the injunction. I think that's right, Your Honor. The one thing I want to make clear is that we think that Monsanto is free, subject to the dictates of whatever its deals with the seed companies are and to the dictates of the antitrust laws to impose those restrictions. It might be the case, and we don't want to prejudge the idea, that they might be acting unlawfully in imposing such a restriction, but we don't think that the— Not because of this injunction. Exactly. All right. Thank you, Your Honor. Thank you, Mr. Lemley. Mr. Wilson has a little time to rebut. Thank you, Your Honor. I just want to correct something I said. The actual replanting occurred in 1999 and 2000. From the 1998 and 1999, perhaps. But before our court order was entered. As to the cross-appeal, we're obviously very relieved to hear Mr. Lemley take the position that we heard. We did make another argument in our brief that the district court should have enjoined Mr. McFarland from obtaining the injunction, but I'd like to just stop obtaining Roundup Ready's seed. But I'd just like to say our principal concern is exactly the point that Judge Bryson got into with Mr. Lemley. The second part, I mean, are you abandoning— We're not abandoning— I mean, there you would be saying, in effect, that even if we were really eager to sell to Mr. McFarland, he'd be violating the court order if he walked into the seed store and asked for something. Well, I think the problem is that he walked into the seed store and got it. Yeah, but— And even though— You were eager to sell it to him. No, even if we had tried not to sell it to him and somehow he had gotten it. I think that is our concern, and that he should be enjoined from doing it. That is our concern with the way the district court not going farther, and I think the district court's order needs to just be reformed on that basis. But if you did reform it according to your second argument, it would seem to me it would prevent you from selling it to him. It—unless we— Unless you went in and got a modification of the order. Unless we went back and agreed to do so, presumably. Thank you. Okay. Thank you, Mr. Wilson. You've both planted the seeds of our decision, which will be forthcoming in due course.